JACK L. ROSENBLIT ET AL. *v.* WILLIAM K.
DANAHER, JR., ET AL.
(13139)

HEALEY, CALLAHAN, GLASS, COVELLO and SANTANIELLO, Js.

Argued November 5, 1987—decision released February 2, 1988

*Mark S. Rosenblit,* for the appellants (plaintiffs).

*Denise Martino Phelan,* with whom, on the brief, was *Andrew J. O'Keefe,* for the appellee (named defendant).

ARTHUR H. HEALEY, J. The ultimate issue on this appeal concerns whether the trial court, *M. Hennessey, J.,* erred in dismissing the plaintiffs' action on the ground of lack of personal jurisdiction under the Connecticut long arm statute, i.e., General Statutes § 52-59b,[1] over

___

[1] General Statutes § 52-59b provides in part: "(a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual, or foreign partnership, or his or its executor or administrator, who in person or through

the named defendant, William K. Danaher, Jr., who is an out-of-state resident. We find no error.

The following background circumstances are set out in order to place in proper context our determination of this matter. The plaintiffs, Jack L. Rosenblit, Jack S. Joseph and Gino Marchetti, who constitute a Connecticut general partnership known as The Worthy Group, instituted an action against William K. Danaher, Jr., David P. Connor, Daniel M. Keyes, Jr., and Leonard Orland, returnable to the Superior Court at Hartford.[2] Rosenblit and Joseph are Connecticut residents. Marchetti is a Massachusetts resident. The defendant Orland, a Connecticut resident, is a law professor in Connecticut and an attorney admitted to practice in Connecticut. The defendants Danaher, Connor and Keyes are all Massachusetts residents. Danaher is also an attorney admitted to practice in Massachusetts. The multicount complaint of the plaintiffs claimed damages and other relief for alleged legal malpractice, fraud, negligent misrepresentation, common law conversion, statutory theft (General Statutes § 52-564) and violations of the Connecticut Unfair Trade Practices Act.[3]

The record discloses the following: In February, 1978, Rosenblit, Joseph and Marchetti, who were developers, formed The Worthy Group for the purpose of rehabilitating the Worthy Hotel located in Springfield, Massachusetts. In order to do so, it was necessary to obtain an exclusive option to buy the site of the hotel, certain building and zoning code variances, formal allocation

an agent: (1) Transacts any business within the state; or (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or (3) commits a tortious act outside the state causing injury to person or property within the state . . . ."

[2] This action was subsequently withdrawn as to the defendants Keyes and Connor.

[3] The complaint was in seven counts and contained approximately 260 paragraphs.

to this project of Section 8 rent subsidies from the United States Department of Housing and Urban Development (HUD) and a Massachusetts Housing and Finance Agency (MHFA) commitment for a long term, low interest mortgage loan. After some contacts and negotiations with certain Massachusetts residents, both corporate and individual, the plaintiffs, in the first half of 1982, sought legal advice from the defendant Keyes with reference to filing a suit against MHFA, the Springfield Redevelopment Authority, the mayor of Springfield, Attorney Anthony W. Ravosa (an associate of the mayor), and a Connecticut developer who allegedly had encountered much more success with developing the rehabilitation of the Worthy Hotel than had the plaintiffs. As a result of Keyes' representations and recommendations, the plaintiffs met with and retained Danaher's law firm to take the case. "Some three months later,"[4] Danaher introduced the plaintiffs to Orland. As a result of representations claimed to have been made to the plaintiffs by both Danaher and Orland concerning the nature of the litigation to be instituted, the dollar potential of a recovery in damages, their expertise in antitrust litigation, their having "joint-ventured many antitrust cases together in the past," as well as a representation that Danaher's law firm and Orland would take the case as "partners," Danaher subsequently filed an antitrust suit[5] on behalf of the plaintiffs in the United States District Court for the District of Massachusetts. Thereafter, the plaintiffs alleged their dissatisfaction with the conduct and nature of this litigation, including the failure to name certain parties as defendants and Danaher's management of

---

[4] The trial court, M. Hennessey, J., found that by the time Orland had been introduced to the plaintiffs, Danaher had already undertaken to represent them.

[5] This action was brought against the city of Springfield, the mayor of Springfield and the "Connecticut developer" in both a corporate and an individual capacity.

the action. Danaher attempted to withdraw from the case, but his first motion to withdraw was denied. The defendants in the antitrust action then moved for summary judgment and, shortly thereafter, Danaher, who filed objections to that motion, again moved to withdraw and his motion was granted. The plaintiffs obtained new counsel whose subsequent motion to add additional counts to the pending antitrust suit was denied. Thereafter, the United States Magistrate issued his "Report and Recommendation on Defendants' Motions for Summary Judgment" that recommended the granting of such motions.[6] The motions for summary judgment by the antitrust defendants were later granted and the present lawsuit ensued.

The plaintiffs sought to make service in this action on Danaher under the Connecticut long arm statute, i.e., General Statutes § 52-59b. Danaher moved to dismiss the action on the ground that the Superior Court lacked personal jurisdiction over him. The trial court, *Purtill, J.*, held a hearing on Danaher's motion at the same time it heard a separate motion to dismiss filed by Orland. In its memorandum of decision filed January 7, 1986, on these motions, the trial court denied Orland's motion.[7] In that memorandum, after a discus-

---

[6] Although there is no such claim in the plaintiffs' complaint, their brief maintains that "judgment [was] subsequently [to the United States Magistrate's Report and Recommendation] granted by the federal court pursuant thereto." Essentially, the complaint alleges that this recommendation of the United States Magistrate was made because "[t]he undisputed facts, viewed most favorably to the plaintiff[s] did not establish" either "the existence of a 'horizontal group boycott' which constituted a 'per se' antitrust violation under Section 1 of the Sherman Act" or "any other basis warranting antitrust liability under Section 1 of the Sherman Act." The single count lawsuit that had been filed in the United States District Court for the District of Massachusetts had alleged that the "Conspirators [the defendants] conducted a 'horizontal group boycott' . . . which [allegedly] constituted a 'per se' violation of Section 1 of the Sherman Act (15 U.S.C. Section 1)."

[7] Orland had filed his motion to dismiss alleging that "(1) the court lack[ed] personal jurisdiction over him, and (2) Connecticut [was] an improper venue

sion of the legal principles involving Danaher's motion, the trial court, *Purtill, J.,* held that the "plaintiff[s'] affidavits, however, are not sufficient to allow the court to make a determination of jurisdiction [as to Danaher] under the long arm statute." It also pointed out that where an issue of personal jurisdiction has been raised, the burden is on the plaintiff to prove the facts establishing personal jurisdiction and that there were questions of fact that existed which could be resolved only by an evidentiary hearing. As to Danaher's motion, it concluded: "No action is taken on defendant Danaher's motion. Defendant Danaher's motion may be reclaimed for argument with full evidentiary hearing."

Later, Danaher's motion to dismiss was reclaimed and came before the trial court, *M. Hennessey, J.* An evidentiary hearing was not held; rather, the parties and the trial court agreed that additional affidavits[8] were to be submitted on the factual issues, together with supplemental memoranda of law. In its written memorandum of decision,[9] the trial court, *M. Hennessey, J.,* granted Danaher's motion to dismiss. In doing so, it

for the litigation." The trial court, *Purtill, J.,* denied his motion on both grounds concluding, inter alia, that service had been properly made upon Orland, a Connecticut resident, by service of papers at his usual place of abode in Connecticut under General Statutes § 52-57 (a). The court also rejected the ground of forum non conveniens advanced by him in the motion.

[8] In keeping with this agreement, three affidavits, dated March 31, 1986, were filed by the plaintiffs. They were those of Jack L. Rosenblit, Jack S. Joseph and Donald E. Weisman; Rosenblit and Joseph had also filed earlier affidavits on August 7, 1985. Danaher, who had not filed an affidavit at the time the motion was heard earlier by Judge Purtill, did file one before Judge M. Hennessey.

[9] The memorandum of decision indicates that the parties to the motion agreed to present in affidavit form that "testimony" which would have been offered by them. Moreover, it points out that they agreed that the affidavits submitted would "pin down those meetings in Connecticut at which Danaher was physically present, and, as to those meetings, what transpired. This [the trial court noted] would bear on the determination of whether or not the minimum contact requirement for operation of the long arm statute was satisfied."

concluded from the facts it found that "the minimum contact requirement for the operation of the long arm statute [had] not been satisfied" and that the plaintiffs had not demonstrated that they should prevail on their alternative claim that jurisdiction existed under an agency theory, i.e., that the claimed tortious acts of Orland were to be imputed to Danaher. This appeal followed.

The plaintiffs claim, regarding the dismissal of the action as to Danaher, that the trial court erred in: (1) not applying, as the law of the case with respect to subsequent proceedings, the law set out by Judge Purtill in his January 3, 1986 memorandum;[10] (2) failing to find in personam jurisdiction over Danaher under General Statutes § 52-59b (a) (1) directly because of his own activities in Connecticut that were undertaken in pursuance of the plaintiffs' antitrust suit; (3) failing to find in personam jurisdiction over Danaher under General Statutes § 52-59b (a) (1) and/or (2) indirectly, because of the activities of his agent, Orland, in Connecticut, that were undertaken in pursuance of, or otherwise related to, the plaintiffs' antitrust suit; and (4) failing to state the factual basis of its decision on certain factual issues and certain claims of law raised

[10] The defendant Danaher correctly pointed out at oral argument that this issue was not raised by the plaintiffs in their preliminary statement of issues and suggests, therefore, that we should not now consider it. The failure of an appellant to include a claim in his preliminary statement of issues, as required by our rules of practice, justifies our refusal to consider that claim. Practice Book § 4013; *Presutti* v. *Presutti*, 181 Conn. 622, 626, 436 A.2d 299 (1980).

Practice Book § 4013, which was effective October 1, 1986, was revised to add, inter alia, the following as the last sentence of subsection (a) (1): "Whenever the failure to identify an issue in a preliminary statement of issues prejudices an opposing party, the court may refuse to consider such issue." The plaintiffs' brief was originally filed in the Appellate Court on November 17, 1986; therefore, the revised rule applies. From what is before us, we conclude that it will not prejudice Danaher for us to review this claim and we do so.

by the parties, thereby violating Practice Book § 4059 and, therefore, erroneously denied the plaintiffs' motion for reargument. We find no error.

I

We turn first to the claim that the trial court did not apply, as the law of the case, the law set out by Judge Purtill in his earlier decision. In pressing this claim, the plaintiffs argue that because Danaher has not, by motion, notice of intention to appeal or the like, undertaken any action, the effect of which would make or seek to make Judge Purtill's decision ineffective, then that decision must be regarded as setting the law of the case that should have been applied by the trial court, *M. Hennessey, J.,* in reaching its decision. The plaintiffs also claim that this position is reinforced by their argument that the two memoranda of decision are essentially complementary because Judge Purtill's memorandum set out the law and made no attempt to make findings of fact, whereas Judge Hennessey's memorandum, which they allege did not set out the applicable law, made findings of fact "to which it should have applied the law as already enunciated [by Judge Purtill]." The plaintiffs' claims are not persuasive.

"The law of the case is not written in stone but is a flexible principle of many facets adaptable to the exigencies of the different situations in which it may be invoked. See 18 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4478. In essence it expresses the practice of judges generally to refuse to reopen what has been decided and is not a limitation on their power. *Messenger* v. *Anderson,* 225 U.S. 436, 444, 32 S. Ct. 739, 56 L. Ed. 1152 (1912)." *Breen* v. *Phelps,* 186 Conn. 86, 99, 439 A.2d 1066 (1982). We observed in *Breen* that the law of the case doctrine is not one of unbending rigor when we said: " 'A judge is not bound to follow the decisions of another judge

made at an earlier stage of the proceedings, and if the same point is again raised he has the same right to reconsider the question as if he had himself made the original decision.' *Santoro* v. *Kleinberger,* 115 Conn. 631, 638, 163 A. 107 (1932)." Id., 98; see also *State* v. *Mariano,* 152 Conn. 85, 91, 203 A.2d 305 (1964), cert. denied, 380 U.S. 943, 85 S. Ct. 1025, 13 L. Ed. 2d 962 (1965). In *Breen,* however, we held that "[a] judge should hesitate to change his own rulings in a case and should even be more reluctant to overrule those of another judge." *Breen* v. *Phelps,* supra, 99.

In the case before us, there is a serious question whether the doctrine of the law of the case directly applies because Judge Purtill did not "decide" or "rule" on the matter of whether Danaher was or was not subject to the in personam jurisdiction of the Superior Court. Accepting the plaintiffs' claim that Judge Purtill set out relevant legal principles but made no findings of fact concerning Danaher's amenability to such jurisdiction, we are left with at least two significant conclusions of Judge Purtill. First, it was because the plaintiffs' affidavits were insufficient at that time to allow him "to make a determination of jurisdiction [over Danaher] under the long arm statute" that he concluded that the existing questions of fact be resolved by an evidentiary hearing that would eventuate if the motion to dismiss was reclaimed "with [a] full evidentiary hearing." Second, Judge Purtill's memorandum specifically stated that "[n]o action is taken on defendant Danaher's motion." Clearly, then, there was no definitive decision or ruling in Danaher's motion to dismiss. We, therefore, do not have a situation where "[the] matter has previously been ruled on interlocutorily" by Judge Purtill so as to make operative the law of the case doctrine. Id. On the other hand, Danaher argues that the trial court, *M. Hennessey, J.,* actually did apply the "law of the case." Judge Hennessey's

memorandum of decision refers to Judge Purtill's memorandum, including Judge Purtill's reasons for not acting on Danaher's motion.

Our examination of the applicable law indicates that Judge Hennessey's findings and conclusions were grounded on the relevant legal principles, many of which were set out in the earlier memorandum of Judge Purtill. "It is important to recognize that a claim of error cannot be predicated on an assumption that the trial court acted incorrectly." *Barra* v. *Ridgefield Card & Gift Gallery, Ltd.,* 194 Conn. 400, 407, 480 A.2d 552 (1984); *Giammattei* v. *DiCerbo,* 135 Conn. 159, 162, 62 A.2d 519 (1948). Rather, we are entitled to assume, unless it appears to the contrary, that the trial court, *M. Hennessey, J.,* acted properly, including considering the applicable legal principles. See *State* v. *One 1977 Buick Automobile,* 196 Conn. 471, 481, 493 A.2d 874 (1985); *Barra* v. *Ridgefield Card & Gift Gallery, Ltd.,* supra, 407–408. Indeed, only recently have we said that "as to judges and courts, under the law of evidence, 'it is presumed, unless the contrary appears, that judicial acts and duties have been duly and regularly performed, the presumption of regularity attending the acts of public officers being applicable to judges and courts and their officers . . . .' The general rule that a judgment, rendered by a court with jurisdiction, is presumed to be valid and not clearly erroneous until so demonstrated raises a presumption that the rendering court acted only after due consideration, in conformity with the law and in accordance with its duty." (Citations omitted.) *Brookfield* v. *Candlewood Shores Estates, Inc.,* 201 Conn. 1, 6–7, 513 A.2d 1218 (1986); W. Maltbie, Connecticut Appellate Procedure § 311. It has not been demonstrated that the trial court failed to consider the applicable law in reaching its decision. We must, therefore, assume that the trial court, *M. Hennessey, J.,* considered everything before it, including the relevant legal

principles set out in the earlier memorandum of Judge Purtill. We find no error on the plaintiffs' "law of the case" claim. We, nevertheless, must now determine whether the granting of Danaher's motion to dismiss was clearly erroneous. Practice Book § 4061.

The plaintiffs next claim that the trial court, *M. Hennessey, J.*, erred in failing to find in personam jurisdiction over Danaher under General Statutes § 52-59b (a) (1) directly because of his own activities in Connecticut that were undertaken in pursuance of the plaintiffs' antitrust suit. We do not agree.

The trial court concluded "from the facts found that the minimum contact requirement for the operation of the long arm statute has not been satisfied." We treat this as the parties do, i.e., that the plaintiffs had not demonstrated, as was their burden, that Danaher was amenable to in personam jurisdiction because of his own activities in Connecticut under § 52-59b (a) (1) and, therefore, under the constitutional "minimum contacts" standard of *International Shoe Co.* v. *Washington,* 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945). In attacking this conclusion, the plaintiffs argue first that they submitted a copy of certain records of Danaher that "detail the professional services . . . [Danaher] claims to have rendered to the plaintiff[s] specifically in pursuance of the [plaintiffs'] antitrust lawsuit . . . ."[11] They claim that "time sheets and itemized statement of legal services constitute credible evidence, in the

---

[11] Attached to the March 31, 1986 affidavit of Rosenblit are what are claimed to be certain time sheets and an itemized statement of Danaher's professional services to the plaintiffs in the antitrust litigation. Wholly apart from any hearsay defect, these materials make brief reference to two other meetings in Connecticut at which three people were purportedly present— Danaher, Orland and Marchetti. No affidavit has been filed by Marchetti to the effect that Danaher was in fact at either of those meetings. These two meetings, the precise dates of which are indistinct, purportedly took place prior to the October 19, 1981 meeting at which the trial court did find that Danaher was in attendance in Connecticut.

nature of a party admission, that . . . Danaher personally attended at least five business meetings in Connecticut with some or all of the [plaintiff] partners . . . and/or with . . . Orland at which . . . Danaher rendered professional services to the plaintiff[s] specifically in pursuance of the [plaintiffs'] antitrust lawsuit . . . ."[12]

In this case, the parties specifically agreed that the trial court could resolve the issue on affidavits. It has been held that where a party agrees to join in "the battle of affidavits," that party in effect consents to be bound by the resulting decision (subject, of course, to exercising his appellate rights). See *Dopp* v. *Franklin National Bank,* 461 F.2d 873, 879 (2d Cir. 1972); *Semmes Motors, Inc.* v. *Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir. 1970); *Phillips* v. *Crown Central Petroleum Corporation,* 376 F. Sup. 1250, 1253 (D. Md. 1973). In considering the "credibility of and ascribing weight to" the affidavits, the trial court could have considered whether an affiant had an interest in the outcome of the litigation. *Carolina Power & Light Co.* v. *Uranex,* 451 F. Sup. 1044, 1055 (N.D. Cal. 1977). One court has noted that "[t]estimony presented by affidavit is different from testimony orally delivered because the affiant is not subject to cross-examination. But that fact leads to greater, not lesser, strictures imposed on the testimony presented by affidavit." *United States* v. *Dibble,* 429 F.2d 598, 602 (9th Cir. 1970). Affidavits,

---

[12] The plaintiffs maintain that these Connecticut meetings took place on August 7, 1981, September 19, 1981, October 19, 1981, October 26, 1981, and December 23, 1982.

Moreover, as a subissue of this claim, the plaintiffs also claim in their brief that Danaher's failure to challenge the authenticity of these "records" constitutes an "authentication" by him of these records, specifically that he did so by his failure to "disown" them when given the opportunity to do so by way of counteraffidavit. This claim will not be considered because it is not set out in the plaintiff's preliminary statement of issues. See Practice Book § 4013; *Presutti* v. *Presutti,* 181 Conn. 622, 436 A.2d 299 (1980).

of course, should state facts within the knowledge of the affiant. See 3 Am. Jur. 2d, Affidavits § 3.

The three affidavits submitted by the plaintiffs to Judge Hennessey were not entirely consistent, when compared to each other, concerning how many times Danaher was in Connecticut. Moreover, two of these affidavits were submitted to Judge Hennessey by affiants who earlier had each also filed an affidavit when Orland and Danaher had filed their motions to dismiss before Judge Purtill. Joseph and Rosenblit filed affidavits on each occasion. Rosenblit's earlier affidavit maintained that he had met with Orland and Danaher twice in Orland's Connecticut office; the dates of the meetings were not set out. His later affidavit refers to only one Connecticut meeting with Danaher and that was in Orland's Connecticut office at which time, he indicated, Orland, Joseph, Marchetti and he were also present. That meeting, his affidavit sets out, was in October, 1981. The third affidavit submitted to Judge Hennessey was by Donald E. Weisman. He had not filed an affidavit before Judge Purtill. The Weisman affidavit refers to only one Connecticut meeting placed as occurring on October 25, 1982, with Rosenblit at Orland's office, but no mention is made that Danaher was present at that time.

Under all of the circumstances, Judge Hennessey could have decided, as she did, that Danaher was at only one meeting in Connecticut—on October 19, 1981. At this meeting, which took place in Orland's office, Rosenblit, Joseph and Marchetti were also present. It was at that time that Rosenblit, Joseph and Marchetti were presented with the draft of the antitrust complaint for their review and comments. Orland told them that he had "produced the draft." Thus, on this branch of the matter, the trial court could find, as it did, that Danaher was only physically present in Connecticut on this matter on one occasion—October 19, 1981.

In claiming that Danaher is amenable to in personam jurisdiction under § 52-59b (a) (1), the plaintiffs contend that the trial court erred in not applying the precedents of *Zartolas* v. *Nisenfeld,* 184 Conn. 471, 440 A.2d 179 (1981), and *Computer Assistance, Inc.* v. *Morris,* 564 F. Sup. 1054 (D. Conn. 1983), not only to the five Connecticut meetings allegedly attended by Danaher, but, at the very least, to the one Connecticut meeting that the trial court found that Danaher had attended. We have already concluded that the trial court properly found that Danaher attended only one Connecticut meeting. The plaintiffs maintain that Danaher's attendance at even that one meeting constitutes "transacting any business" under the broad standard of § 52-59b (a) (1), which embraces "a single purposeful business transaction," under *Zartolas* v. *Nisenfeld,* supra, 474. In support of this position, they also argue that the *Zartolas* court specifically held that that broad interpretation of the "transacting any business" standard of the Connecticut long arm statute satisfied the "minimum contacts" constitutional requirement of *International Shoe Co.* "despite the fact that the Iowa defendants in [*Zartolas*] had not solicited the Connecticut plaintiff's business." Thus, it asserts that even Danaher's attendance at the October 19, 1981 meeting in Connecticut alone mandated that the trial court rule that Danaher was amenable to in personam jurisdiction under § 52-59b (a) (1) and satisfied the "minimum contacts" constitutional requirement of *International Shoe Co.* We are not persuaded.

The statute does not define what the phrase "transact any business" means, but in *Zartolas* we construed it "to embrace a single purposeful business transaction." *Zartolas* v. *Nisenfeld,* supra. We said that the "term 'transact any business' extends beyond the typical commercial enterprise to include the execution [in Iowa] of a warranty deed pursuant to a single sale of

real property [in Connecticut]." Id. The situs of the real property in Connecticut suggests, on further analysis, that *Zartolas* is distinguishable factually from the case before us. It is clearly so. In *Zartolas,* the defendants conveyed Connecticut real estate to the plaintiff by a warranty deed executed in Iowa. Thereafter, the plaintiff brought an action in Connecticut against the defendants for damages for the breach of a covenant in the deed alleging, inter alia, that at the time of execution the defendants did not own part of the land "conveyed." We noted that the "execution of a warranty deed pursuant to a sale of real property [was] a legal act of a most serious nature," that "the defendants' purposeful Connecticut related activity suffices to locate this transaction . . . within this state," and that "[t]he deed described the land as located [in Connecticut] and designated it by reference to records maintained [in Connecticut]." Id., 475.

This court went on to say: "By owning land in Connecticut the defendants invoked the benefits and protection of Connecticut's laws of real property, including as an incident of ownership the right to sell the property. If the defendants breached their warranties, the breach occurred because of acts committed here [in Connecticut]. The warranties in the deed clearly anticipate litigation in Connecticut, *which is the only forum that can determine title to Connecticut land. Durfee* v. *Duke,* 375 U.S. 106, 115, 84 S. Ct. 242, 11 L. Ed. 2d 186 (1963); *Farmers' Loan & Trust Co.* v. *Postal Telegraph Co.,* 55 Conn. 334, 335, 11 A. 184 (1887); *In re Goar's Estate,* 252 Iowa 108, 110, 106 N.W.2d 93 (1960). Thus, the fundamental incidents of this warranty deed render the defendants' purposeful execution of it a 'transaction of any business within this state.' *Hi Fashion Wigs, Inc.* v. *Peter Hammond Advertising, Inc.,* [32 N.Y.2d 583, 586, 300 N.E.2d 421, 347 N.Y.S.2d 47 (1973)]." (Emphasis added.) *Zartolas* v.

*Nisenfeld,* supra, 475–76. Therefore, the "fundamental incidents" of the warranty deed in *Zartolas* "render[ed] the defendants' purposeful execution of it a 'transaction of any business within this state.' " Id., 476. In *Zartolas,* we eschewed "resort to a rigid formula" in resolving the transaction of business in Connecticut but rather determine it upon a balance of "consideration of public policy, common sense, and the chronology and geography of the relevant factors." Id., 477. Requiring the defendants to defend the Connecticut litigation did not, under the circumstances in *Zartolas,* offend "traditional notions of fair play and substantial justice" under such cases as *International Shoe Co.* We specifically pointed out that inasmuch as the defendants had "purposefully availed themselves of the privileges of owning and selling Connecticut land . . . [then] this state may require them to defend a Connecticut suit alleging breach of the deed's warranties." Id., 478. Clearly, Connecticut was the *only* possible forum in *Zartolas.*

The case at hand is thus readily distinguishable from *Zartolas* on the facts. In this case, two Connecticut residents, Rosenblit and Joseph, went to Massachusetts and there, with Marchetti, a Massachusetts resident, hired an attorney, who resided and practiced law in Massachusetts, to bring an action that arose out of a series of contacts by the plaintiffs with Massachusetts residents in the main. In addition, the proposed action concerned not only events that had occurred in large measure in Massachusetts and arose out of the plaintiffs' efforts to rehabilitate real property situated in Massachusetts, but also involved a number of the potential witnesses from Massachusetts. Even though it is true that Orland resides in Connecticut and some witnesses may reside in Connecticut, on balance we cannot say that *Zartolas* or *Computer Assistance, Inc.,*[13]

---

[13] In *Computer Assistance, Inc.* v. *Morris,* 564 F. Sup. 1054 (D. Conn. 1983), the employer, Computer Assistance, Inc., a corporation headquar-

required, under relevant legal principles, that the trial court hold Danaher amenable to in personam jurisdiction under § 52-59b (a) (1). The plaintiffs have not sustained their burden of proof of establishing the facts

tered in Connecticut, had brought an action in the United States District Court for the District of Connecticut against Morris, its former employee, alleging breach of a noncompetition agreement. Morris, a Texas citizen, filed a motion to dismiss the Connecticut action or, in the alternative, to transfer it to the federal District Court in Texas. The United States District Court for the District of Connecticut found that there was a statutory basis under General Statutes § 52-59b (a) for the assertion of personal jurisdiction over Morris in Connecticut and that such assertion was constitutional. The court, Cabranes, J., however, determined that while the action *"could"* be maintained in Connecticut "without offense to due process, the cause of due process [was] better served by maintenance of [the] action in Texas." (Emphasis in original.) Id., 1059. Indicating that whether personal jurisdiction comports with due process "requires assessment of many fundamentally equitable considerations," the court ordered the action transferred to Texas. Id.

*Computer Assistance, Inc.,* is clearly distinguishable from the case at hand on the facts. Computer Assistance, Inc., hired Morris in 1979 to manage its Houston branch; at that time he became its managing partner in Houston. Some portion of the negotiations leading to this 1979 agreement, which contained a noncompetition clause, took place in Connecticut and the agreement itself was signed by Morris in Connecticut. Later in 1979, Morris came back to Connecticut either to sign an additional agreement or to receive training or both. These were the only occasions that Morris was in Connecticut between 1979 and September, 1982, although he did communicate with Computer Assistance, Inc.'s headquarters "frequently" by telephone and mail. Relations between Computer Assistance, Inc., and Morris apparently became strained and Morris came to Connecticut in September, 1982, concerning a new agreement. It would appear that in that month their relationship was dissolved and at that time both the parties signed a "memorandum of understanding." There was no dispute that in the same month Morris set up his own enterprise that directly competed with Computer Assistance, Inc., in the Houston area. In the Connecticut action, his former employer alleged that that action breached their 1979 agreement, which contained the noncompetition clause.

It is apparent from a recital of the circumstances above that the *Computer Assistance, Inc.* court had "no difficulty in finding a statutory basis for the assertion of personal jurisdiction over Morris in Connecticut." Id., 1059. Morris was, in large measure, Computer Assistance, Inc., in the Houston area. He was its managing partner there. Over the period from late 1979 until September, 1982, he was "frequently" in telephone and mail contact with his company's headquarters in Connecticut. In addition, he

pertaining to personal jurisdiction over Danaher under
§ 52-59b (a) (1). See *Standard Tallow Corporation* v.
*Jowdy,* 190 Conn. 48, 459 A.2d 503 (1983). With this
conclusion that the statutory requirements were not
met, it is not necessary for us to decide whether the
exercise of jurisdiction over Danaher violated constitu-
tional principles of due process. See *United States Trust
Co.* v. *Bohart,* 197 Conn. 34, 38–39, 495 A.2d 1034
(1985); *Lombard Bros., Inc.* v. *General Asset Manage-
ment Co.,* 190 Conn. 245, 250, 460 A.2d 481 (1983);
*Zartolas* v. *Nisenfeld,* supra, 473–78; 2 J. Moore, Fed-
eral Practice (2d Ed. 1982) § 441.1 [1], pp. 4-421—4-422.

II

The plaintiffs next claim that the trial court erred
in not finding that Danaher was subject to in perso-
nam jurisdiction indirectly under General Statutes
§ 52-59b (a) (1) and/or (2) because of the activities of
his "agent" Orland in Connecticut that were under-
taken in pursuance of, or otherwise related to, the plain-
tiffs' lawsuit. In advancing this alternative basis for
claiming jurisdiction, the plaintiffs claim that Danaher
and Orland were "actual or apparent partners or co-
venturers with respect to their initiation and conduct
of [their] antitrust lawsuit." We will not consider this
branch of the plaintiffs' claim.[14]

was physically in Connecticut on three occasions during his employment
with Computer Assistance, Inc. Yet, while it found Morris' "contacts" with
Connecticut "sufficient" on the constitutional level, the court, neverthe-
less, transferred the case to Texas after assessing fundamental equitable
considerations. *Computer Assistance, Inc.,* is inapposite to the case before us.

[14] At oral argument, Danaher took the position that this claim should not
be considered as it was not set out in the plaintiffs' preliminary statement
of issues, which, we note, was never amended. See Practice Book § 4013;
*Presutti* v. *Presutti,* 181 Conn. 622, 626, 436 A.2d 299 (1980). The plain-
tiffs did not take issue with Danaher's assertion. On examining the plain-
tiffs' preliminary statement of issues, we find that Danaher is correct. This
stated claim is not properly before us and will not be considered. Practice
Book § 4013; *Presutti* v. *Presutti,* supra. Moreover, to consider this branch
of their claim would prejudice Danaher. Cf. footnote 11, supra.

The plaintiffs challenge the trial court's conclusion that even "absent the existence of any partnership or joint venture relationship" between Orland and Danaher, the actions of Orland in Connecticut, which the trial court set out in its memorandum, could not be imputed to Danaher under any agency theory. These actions refer to certain alleged threats made by Orland. These allegedly include one made on October 25, 1982, to stop consultations on the case without responding to the antitrust defendants' interrogatories, another allegedly made on December 14, 1982, not to file a brief essential to forestall dismissal of the antitrust case, and another allegedly made on December 17, 1982, not to respond to certain interrogatories of the antitrust defendants. The trial court's memorandum stated that, as to the claimed threat of December 17, 1982, which allegedly took place during a telephone conference call between Orland and Rosenblit in Connecticut and Danaher in Massachusetts, the fact that Danaher did not contradict certain statements made by Orland during that call, i.e., that Danaher would be incapable of responding to the interrogatories without Orland's actual assistance and because of Orland's expertise, "standing alone cannot be raised by [the trial court] to the level of anything but an ambiguous silence." As to this, the trial court pointed out that Danaher's affidavit specifically stated that "[a]t no time during said conference did [he] hear" Orland make such a statement. It is clear that the trial court, in passing on this matter, made decisions as to the credibility of the alleged conduct of both Danaher and Orland, as it was proper for it to do, and the plaintiffs have not demonstrated that we should disturb that determination.

Although the trial court did not explicitly find that Orland was an "independent consultant," as Danaher characterized him in his affidavit, the trial court did find that Orland's being brought into this matter was

nothing more than that of an attorney "who, at some point in his handling of the case, decide[d]" to bring in an expert deemed necessary to enable him to proceed with the case. It did determine that certain language allegedly used by the defendant such as that they were a "litigating team" or "partners" for this case would not, in context, cause the imputation to Danaher of any statement or representations by Orland "since there would be no principal-agent relationship."

Assuming that Danaher's assertion that Orland was not his "agent," but his "independent consultant" is correct, then it appears to us that Orland was an "independent contractor" and that the trial court had implicitly so found. The plaintiffs reject Danaher's statement that Orland was an "independent consultant,"[15] arguing first that it is a conclusion of law and not fact and, second, that it is a misstatement of the law. The plaintiffs quote from the Restatement that "[o]ne who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor." Restatement (Second), Agency § 14N. It goes on to quote a portion of a comment from another section of the Restatement which states: "Thus, the attorney at law, the broker, the factor, the auctioneer and other similar persons employed either for a single transaction or for a series of transactions are agents, although as to their physical activities they are independent contractors." Restatement (Second), Agency § 1, comment e. This is not quite in context;[16] the sentence just quoted immediately follows this sentence: "An agent may be one for whose physical acts the

---

[15] The plaintiffs offer no meaning of "independent consultant" except to argue that under § 14N of the Restatement (Second) of Agency he is also an agent even if he is also an independent contractor.

[16] In addition, in § 14N of the Restatement (Second) of Agency another comment, i.e., comment b, discusses a class referred to as "Non-agent independent contractor."

employer is responsible and who is called an independent contractor in order to distinguish him from a *servant,* also an agent, for whose physical acts the employer is responsible." (Emphasis added.) Restatement (Second), Agency § 1, comment e. In addition, the definition of an "independent contractor" in the Restatement blunts whatever thrust there is to that portion of § 14N above that the plaintiffs quote. Section 2 (3) of the Restatement (Second) of Agency defines an "independent contractor" as follows: "An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. *He may or may not be an agent.*" (Emphasis added.) It is telling to note, as one court points out, that "[*f*]*or jurisdictional purposes,* the courts have distinguished an agent from an independent contractor by reference to the measure of control." (Emphasis added.) *Rose* v. *Silver,* 394 A.2d 1368, 1371 (D.C. App. 1978). *Rose* was a case in which the plaintiff invoked the District of Columbia long arm statute against the defendant and the issue of "agent" or "independent contractor" was significant. *Rose,* in speaking to the "measure of control," said: "It is this lack of control over an independent contractor that results in the contractor's 'unilateral activity' which the [United States] Supreme Court in *Hanson* v. *Denckla,* [375 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)], held not imputable to the out-of-state defendant for the purpose of obtaining personal jurisdiction. . . . Control over the forum state actor, on the other hand, results in 'the defendant's purposefully avail[ing] itself of the privilege of conducting activities within the forum State,' id. at 253, 78 S. Ct. at 1240—enough to satisfy the 'minimum contacts' test." *Rose* v. *Silver,* supra. The portions of the Restatement (Second) of Agency quoted by the plain-

tiffs are, therefore, not as compelling as claimed; other sections to which we refer cut persuasively the other way.

The trial court was presented with questions of fact to resolve. The question of status, in the absence of controlling circumstances, is one of fact. See *Francis* v. *Franklin Cafeteria, Inc.*, 123 Conn. 320, 324, 195 A. 198 (1937). The existence of an agency is a question of fact. *Fuessenich* v. *DiNardo*, 195 Conn. 144, 159, 487 A.2d 514 (1985); *Beckenstein* v. *Potter & Carrier*, 191 Conn. 120, 133, 464 A.2d 6 (1983). Questions concerning the creation of an agency relationship are ones of fact. *Frigon* v. *Enfield Savings & Loan Assn.*, 195 Conn. 82, 85, 486 A.2d 630 (1985). The determination of the status of an individual as an independent contractor or employee is, in the absence of controlling considerations, a question of fact. See *Francis* v. *Franklin Cafeteria, Inc.*, supra, 326. We cannot say that on this record the trial court was clearly erroneous in resolving the issues on the agency claim as it did.

### III

Finally, the plaintiffs claim that the trial court erred in not stating the factual basis of its decisions on certain factual issues, in not stating its conclusions on certain claims of law raised by the parties in violation of Practice Book § 4059 and, consequently, erred in not granting their motion for reargument and rehearing dated May 27, 1986,[17] and they also filed a memorandum of law setting out their claims. We find no error on this claim.

---

[17] The plaintiffs' "Motion for Reargument and Rehearing" is as follows:

"The Plaintiff[s] in the above-entitled case moves that the judgment of the Court, (M.) Hennessey, J., rendered in the above matter on May 6, 1986, be set aside and set down for reargument with a full evidentiary hearing only in the event that the Plaintiff[s'] Motion To Set Aside and Reverse The Judgment of even date is denied. The ground upon which the Plaintiff[s] relies is that, in the event that said decision is not found to be clearly

In that motion, the plaintiffs moved that the trial court set aside its judgment and set the matter down for reargument with a full evidentiary hearing. In doing so, they claimed that if the decision was not found to be clearly erroneous in view of the evidence in the record, "then, at the least, said decision [was] based upon insufficient factfinding and insufficient consideration of applicable law, the remedy for which is further proceedings . . . ." The trial court denied the motion on June 9, 1986. On June 30, 1986, the plaintiffs filed their appeal to the Appellate Court. On August 14, 1986, the plaintiffs filed their motion for further articulation in the trial court, setting out in the motion five matters upon which they requested articulation. On August 21, 1986, the trial court, in a written memorandum of decision, denied this motion. In doing so, it directed the plaintiffs to their memorandum of law dated May 27, 1986, filed in support of their motion of May 27, 1986, "in which [the trial court said] the plaintiffs set forth the facts found by the court as to those issues now raised by them in their Request for Further Articulation." The five matters upon which the plaintiffs sought the further articulation are identical to those claimed by the plaintiffs in their motion for review[18] filed in the Appellate Court after the trial court denied the further articulation.

---

erroneous in view of evidence in the record such that a reversal thereof is mandated, then, at the least, said decision is based upon insufficient factfinding and insufficient consideration of applicable law, the remedy for which is further proceedings on the matter.

"In support of this Motion the Plaintiff[s] relies upon the Memorandum Of Law attached hereto."

[18] On August 25, 1986, the plaintiffs filed in the Appellate Court their motion for review; see Practice Book § 4058; and their motion for an order of compliance. See Practice Book § 4183 (1).

On October 2, 1986, the Appellate Court granted the motion for review but denied the relief requested therein. On that date, it also denied the motion for an order of compliance.

Practice Book § 4060 provides in part that the trial court "shall . . . [state] its decision on the issues in the matter and the factual basis of its decision." It also requires that it "shall include in its decision its conclusion as to each claim of law raised by the parties." We have recently said that "[a]n articulation may be necessary where the trial court fails completely to state any basis for its decision . . . or where the basis, although stated, is unclear." *State* v. *Wilson,* 199 Conn. 417, 434, 513 A.2d 620 (1986). "An articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification." Id., 435. Articulation, in a proper case, assists in the ability of an appellant to provide this court with an adequate appellate record to ensure meaningful review. See id.; *DeMilo* v. *West Haven,* 189 Conn. 671, 681, 458 A.2d 362 (1983). Whether the findings of fact and conclusions of law are adequate for meaningful appellate review depends upon whether they evince a valid basis under the issues for the legal result reached by the trial court. We find no error on this claim of the plaintiff.

We have examined the trial court's six page decision in considering the plaintiffs' claims and the trial court's action. We conclude that they are without merit. One, however, deserves a brief discussion. There, the plaintiffs claimed that the trial court failed to set forth its legal conclusions on whether "the plaintiff[s] failed to meet [their] burden under (a) the statutory standard of [General Statutes] § 52-59b (a) (1), or (b) the constitutional 'minimum contacts' standard of *International Shoe Co.* v. *Washington,* [supra,] and its progeny, or (c) both standards." In its memorandum of decision, the trial court said in part: "We conclude from the facts found that the minimum contact requirement for the operation of the long arm statute has not been satisfied." The plaintiffs do not, in their brief, point out why this particular "defect" has inhibited them from actu-

ally comprehending the decision. See *DeMilo* v. *West Haven,* supra. It would appear from an examination of their brief filed in the trial court on their motion for reargument and rehearing that the plaintiffs made their claim assuming that the trial court had made the proper analysis concerning the Connecticut long arm statute and the constitutional "minimum contacts" standard. See *Lombard Bros., Inc.* v. *General Asset Management Co.,* supra, 250; *Zartolas* v. *Nisenfeld,* supra, 473–74, 481. Their claims in that brief proceeded on that assumption, especially when they point out that the trial court concluded "that the minimum contact requirement for the operation of the long arm statute ha[d] not been satisfied." There, the plaintiffs said: "Viewing this pronouncement in the light most favorable to Defendant Danaher, it is here assumed that the Court has impliedly found that said Defendant is not amenable to the in personam jurisdiction of this Court either under the statutory standard of C.G.S. Section 52-59b (a) (1) ('transacts any business within the state') *or* under the constitutional 'minimum contacts' standard of *International Shoe Co.* v. *Washington."* (Emphasis added.) The plaintiffs then proceeded to make their analysis based on that assumption. Although the trial court's memorandum should perhaps have explicitly spelled out the two phase analysis involved; see, e.g., *Lombard Bros., Inc.* v. *General Asset Management Co.,* supra; the plaintiffs made their legal claim on the assumption that it had. We are entitled to presume that the trial court considered this and the other relevant claims that the plaintiffs made in reaching its decision. See *Brookfield* v. *Candlewood Shores Estates, Inc.,* supra. The fact that the trial court, in denying the plaintiffs' motion for further articulation, referred the plaintiffs to this very brief strongly supports the view that it did make the necessary analysis. There is little question that it would have been the better practice to state so

explicitly in its memorandum. Under the circumstances, however, we conclude as dispositive of this issue "[t]he general rule that a judgment, rendered by a court with jurisdiction, is presumed to be valid and not clearly erroneous until so demonstrated raises a presumption that the rendering court acted only after due consideration, in conformity with the law and in accordance with its duty." Id., 7. On this record, we cannot conclude that it has been demonstrated that the trial court did not so act.

There is no error.

In this opinion GLASS, COVELLO and SANTANIELLO, Js., concurred. CALLAHAN, J., concurred in the result.